JANJIN MAGNESIUM INTL v. United States Government May I please report? Two issues here, simply stated. One is whether Commerce may draw an adverse inference for conduct of an unaffiliated supplier and connected with that was the issue of control whether there was control over this unaffiliated supplier. Let me ask you a question. I was shocked not to see a gray brief in this case, a reply brief. Are you conceding the waiver argument that was made? We are not, Your Honor. But due to some issues having to do with medical and confusion in my office, the brief was not filed and so we had to let it go. Okay, so let me ask you. The argument that was made in the red brief is that in fact, your primary argument on appeal is one that you won below at the CIT and then it went back for the redetermination. So you're arguing here that you can't simply rely on the acts of an unaffiliated supplier and the CIT agrees with you on that point, right? The unaffiliated supplier here committed the acts and there's no question about that. We have no question about that. The issue is whether the unaffiliated supplier's acts can be ascribed to my client, to TMI. Okay, all right. But the way you argued it, the first argument that you made in your opening brief was that the mere acts of an unaffiliated third party can't be chargeable, correct, for purposes of the adverse facts or the inference that would be charged against you. The CIT agreed with you, sent it back, and the redetermination said, all right, we're not going to rely solely on the third party conduct. We're going to look at Kenyon's conduct and see what they did, isn't that right? And the conduct that they looked at is not supported in the record, Your Honor. There are conclusory statements in the remand that is not supported in the verification report, in the analysis memo, there is nothing there. It is simply statements that first, that TMI had control over the company because it submitted the data, that it went to verification, and that it should have known. But there's nothing in the underlying factual record of the case to support those conclusory statements. Okay, so your argument is not a legal one as you made it in the blue brief, the legal one you'd already won below, your argument is really relating to the factual determination that your client can be chargeable for the joint activity, is that right? Yes, they are both, they're interconnected. The unaffiliation and the charge that my client had the ability to control this much larger company, but there is nothing in the record to substantiate that. All right, so that changes your standard of review because we're not now saying they applied the wrong legal standard, you're asking us to find that as a matter of fact, there was not substantial evidence to support the conclusion. On the record, that you have a review on the record at this court. Okay. That our review on the record is based on substantial evidence. Yes, yes. Okay. All right, so how do you get around some of the facts that were cited in the redetermination, and again, because you didn't file the reply brief, you never really addressed those facts in your written submission. The TMI is a small trading company, less than 10 employees. The supplier was a large corporation, manufacturing many products, not just the product that my client bought from them. They had thousands of employees. To say that, and this is shown in the verification report and in the other underlying information. The large company with multiple factories making many products, there's nothing on the record that demonstrates that my client had the ability to control that. Counselor, you're involved in cross-border trade of the products that were subject to the review, and any time you file information, you file a certification on that information as to the accuracy and the veracity of that information. The government are saying that the falsification of that information was so evident that you should have caught it. The information involved is byproducts. It is not the main products that are being made, the main inputs being made. This was considered to be a small matter. The actual problem arose on the afternoon of the last day of a seven-day verification at three locations in rural China. The fact that the Commerce Department took so long to find this, you can't expect my client, which does not have control of this company, it's an unaffiliated company, to try to discover all of this. But you don't have an affirmative obligation to ensure the accuracy and the veracity of it? My client takes that affirmative obligation very seriously, and they do the best they can, but when you have an unaffiliated party, you can't always find out everything. But when your client's claiming the reduction is based on byproducts, and then your client then undertakes to provide the information from the third-party supplier, doesn't that change things? They undertake to provide the best information they can do, but they can't check all the information. They have to work on a basis of trust with this company. And my client, the tail does not wag the dog in this case. My client was a small company buying a product from a large company. They couldn't demand access to everything. They did the best they could. That's what I'm saying. We're looking at an issue involving an offset, and that would have operated to the advantage of your client. So you have a choice whether to seek the offset or not. Shouldn't the question of whether the information, the basis, the data that you're submitting, shouldn't that be a decision that an reporter or an expert would make in determining whether to seek an offset? The issue really didn't arise until the problem was discovered by the Commerce Department. My client took it on faith that the information was valid as it took all the other information. It had no reason to suspect it until the time of the discovery. Thus, it went forward, and it certified to the information as factual. So if you took it on faith, and the information turned out to be false, shouldn't you pay the price for that? TMI should not pay the price. There should not be no consequences, certainly, but my client should not be charged with adverse facts available. There should not be an adverse inference because they were not the party that did this. It was an unaffiliated party, and we rely on SDS. But the whole action turned the information that you submitted unreliable, especially with respect to the offsets. With regard to the offsets. We do not agree that the rest of the information was unreliable. We believe the rest of the information was reliable and that there was sufficient information on the record that the Commerce Department could have calculated or rated. You're saying that the massive fraud, even to the point of throwing law books out the window and doctoring records, that all of that was something that TMI didn't know, and when verifying the accuracy of the information they were submitting to Commerce couldn't have determined? TMI did not know this, no. And frankly, the byproducts were a small matter. The important thing was to get the main products, the main inputs verified, plus the labor, plus all the other things. And the byproducts were something that was claimed, but it was not the main focus of TMI on this. So you're saying that it's not only an issue of you not wanting to apply the 111.73 rate, but that you believe there shouldn't be any adverse facts applied. There should not be adverse facts. There should be facts available, but not adverse facts available. TMI does not dispute that there has to be facts available applied, but there should not be an adverse inference in this case. That is our point. Assuming there is an adverse inference, what is the basis for your argument, or what is your response, I guess, since you didn't file your reply brief, to the arguments that both Commerce and the interviewer make, which is that there was no other way to determine an appropriate rate because of the scope of the fraud? There is information of record in which a rate could be calculated. You could eliminate the byproducts. That's one way to do it. A second way is to use TMI's rate from another review. There is valid information from another review for TMI based on products it not only sold, but that it produced in its own factory. To the extent that you're arguing for consideration of later reviews, do you... This is in a previous review, Your Honor. So you can see that to the extent that you pointed out later reviews, that those reviews are not probative of this point in time. What I said was the court could take judicial notice of that, but at this point, we believe that the previous review of TMI based on its own production and sales would be relevant. But didn't that previous review also involve the same supplier? The review involved the same supplier, but the calculations are separate. Where you have a different factory, you have different calculations. The Commerce Department performs different calculations for each supplier. And in this case, they have a different calculation for TMI's production from the supplier's production. Now, Mr. Riggle, you didn't save any time for rebuttal. Do you want to reserve what you have left on the clock, or do you want to use up the rest of your time right now? Let me just say a short thing here. The Commerce Department said that it could not use a previous rate for TMI because it would reward the company. The Anti-Dumping Statute does not talk about rewards or punishments. That's simply a wrong concept. What the Anti-Dumping Law requires is an accurate rate tied to respondent's actual margin. That's from Gallon-Ocean. To give TMI a high rate is to punish TMI, and that's not part of the Anti-Dumping Statute. Isn't it really to provide an incentive to interested parties to submit accurate and complete information and investigations? That's what the Commerce Department says, but that's not what DiCicco teaches us. DiCicco teaches us that the rate should be a reasonably accurate rate with some additional amount to ensure compliance. But that's a different issue than what you were just arguing. We're talking about the application of the AFA rate. That's what I'm talking about. And what we're saying is that it would require a punitive margin on TMI. It's an aberration. 111.73% is essentially confiscatory. It's more than 100%, more than the price of the product. And as I say, there's actual information on the record, and there's actual information based on what TMI, the rate it had gotten for its own production in a previous review. And I'll rest there and reserve whatever I have, in case you have some questions. Thank you. Thank you. All right. Split argument here today. We'll hear from Ms. Gerber first. May it please the Court. Commerce applied adverse instances here because of TMI's behavior, not because of its supplier's behavior. There's no discussion in the remand about whether TMI could control the unaffiliated supplier. The remand, in detail, discusses TMI's own behavior. TMI was very hands-on in the collection and the production of data to Commerce, which it certified as accurate and complete to the best of its knowledge. And not only that, it supplied additional information for these offsets. Now, TMI's own behavior in going physically to its producer, collecting the data and formatting it and submitting it to Commerce, suggests that TMI did have access to records. And during verification, it became clear that there was information that was readily ascertainable to anyone with access to the producer's facilities that either TMI ignored or that TMI just failed to acquire. You're not debating the CIT's original decision that you can't simply charge TMI with the conduct of an unaffiliated third-party producer. We are not debating that. No, you're not. You're accepting that proposition of law. That's correct. We are dealing with the remand redetermination, which more than half a dozen times explicitly stated TMI failed to cooperate to the best of its ability. It does say that repeatedly, but isn't it true that the glaring facts, all the dramatic facts, all the fun facts, are the ones that really they found when they got into the producer? Certainly the most dramatic facts are the producer's acts, but the remand redetermination does not focus on those facts. The redetermination focuses on the fact that, for example, with the magnesium byproduct offset, TMI has suggested that that byproduct should be valued at 99% magnesium. Now, during verification, commerce officials asked the suppliers what percentage of this byproduct is magnesium, and they said anywhere between 1% and 5%. Three different people at the producer gave a completely different answer from the one that TMI had submitted to commerce. Similarly, with the cement clinker byproduct offset, at verification there arose this idea that there was a complicated three-party transaction in terms of selling that byproduct offset, and when commerce tried to get more information about that and said, is this what you've been doing in the past, TMI's counsel, no one from the supplier, but TMI itself said, oh, they used to throw that out, it wasn't worth that much, and they just threw it out in the past. Now, given that information, and given that TMI knew that information, commerce, in its remand redetermination set, that indicated that TMI should have actually looked into whether those sales actually occurred. And if they had done that, they would have seen that these voucher books were incorrect or didn't exist or were being fabricated, or they simply would have said there's no documentation of this, and TMI simply could have not requested that extra offset. That is TMI asserting that this information is correct and certifying that to commerce without actually doing what is required. And what's required is that TMI has to do the maximum it is able to do. That's language from Nippon Steel. And that means it is required to conduct prompt, careful, and comprehensive investigations of all the relevant records to the best of its ability. And it simply did not do so here. And commerce, there's easily substantial evidence on the record that commerce determined that TMI itself, again, not the supplier, but TMI did not do all it could do to make sure that the information it was certifying as accurate was accurate. But is this a way around the rule that the Court of International Trade puts forth, which is that you can't just charge them with the third-party conduct by saying, okay, what we're going to do is create an affirmative obligation to go search through the third-party records. Absolutely not, Your Honor. It's not a way of getting around it. It is a recognition that the statutory language that says acting to the best of its ability is what is required. It does have an affirmative obligation to try to figure out whether information from other parties is correct. Now, that does not mean that TMI was responsible for knowing everything about the producer, or if the producer was not being helpful or said, we won't let you look at our records, or said, we'll just give you information, you can't come to our offices, we'll just send it to you. That very well may have been TMI acting to the best of its ability, but that's not what happened here. TMI, for example, asked for extensions of time so it could physically go to its producer and collect the data from the producer. And it did so, and there's no indication that TMI has ever said that it couldn't get access to records that it needed or wanted. So your opponent says that he trusted the supplier of the information. Is trust enough? Does that satisfy the obligation that a practitioner certifies to in the certification to provide information that's accurate and complete to the best of their knowledge and ability? In the circumstances of this case, no, Your Honor. Again, an example that I previously spoke about was the cement clinker offset. There was reason for TMI to suspect that maybe this was not really what was going on, or maybe it needed to look into what was actually happening before it affirmatively sought the offset. TMI knew that its supplier had previously been farming out the clinker and was now claiming that it sold it. But apparently never looked into whether that was actually occurring. Not only that, but Commerce made a specific finding that TMI actively impeded the Commerce's verification and the review because TMI's own representatives, even throughout verification, contradicted what was being told by the supplier. It was not simply a matter of trusting data, and then when you find out that maybe you had something incorrect, saying, oh, okay, well, let's correct that. TMI contradicted what the supplier itself said about how the voucher books were created, why they had cut-and-paste entries in them. What about your opponent's argument that the AFA rate that was established was punitive in nature and did not reflect commercial reality? We absolutely disagree with that, Your Honor. The requirement that the selective rate be corroborated is absolutely fulfilled here. The 111% rate is from the immediately prior review with a cooperating mandatory respondent who was also eligible for a separate rate. This was a calculated rate about that this was actual amounts of dumping that was occurring. But didn't it turn out to be equivalent to the China-wide rate? The China-wide rate is very similar, yes, Your Honor, but that does not negate the fact that this was a calculated rate from actual data provided by a separate rate respondent. These byproduct offsets that were the subject of this attempted verification, do you agree that they were a very small factor? They are certainly a small part of the amount of data that's required to collect. In verification, the problems were not simply with the byproduct offset. The supplier made it impossible for Commerce to verify all of the factors of production. There was a complete failure to verify the factors of production. They would not grant Commerce access to computers. They locked doors, wouldn't let them go through physical papers. So although the information that Commerce was able to determine was actually false from TMI's original submission does not mean that all the other data were correct or that Commerce could verify the rest of the information. So there was no reason, given what was discovered about the byproducts, there was no way for Commerce to verify the rest, and the fact that they couldn't verify the rest of the data, that meant that Commerce reasonably determined that all of that data was not reliable. But the fact that the 111 plus rate is such a spike from every other rate ever applied to TMI, doesn't that raise a question about whether there's a punitive component to it? Well, the rates, the only other calculated rate on the record was the previous review, and that included the offsets, and it was using some of the data from the supplier that Commerce now had reason to believe was not reliable. There was a reason for Commerce to not rely on that data, which, as a side note, has in fact been remanded, and there's actually a different rate there now. But that aside, Commerce determined that that was the only other calculated rate. It was Datui's rate and TMI's rate, and if TMI's rate was not reliable, Datui's rate was the most accurate rate, and the China-wide rate. Why couldn't you rely on the petition rate? The petition rate, that was not as reliable and relevant to current dumping rates that were actually occurring. Now, Datui's rate is the most recent review. It is a calculated rate. There was on the record a 69.53% rate from 1998, but there's no reason to believe that that was a more reliable, more relevant data point for Commerce to use. Commerce was completely within its statutory requirements, and there's substantial evidence that this rate, the rate chosen, which was from the immediately prior review, with a separate rate respondent, a calculated rate, that that was an appropriate rate to apply and not punitive. So the petition, I think, was filed in 1995, where the underlying dumping investigation was included then, and this remand determination was in 2007, 2008. Are you saying that when you have that many years that have elapsed from the underlying investigation to a remand investigation, that the petition rate is no longer valid in those circumstances? No, Your Honor, not that it's no longer valid, but that there was no reason to think that that rate was so much more reliable and relevant as compared to the immediately prior review, a calculated rate from an actual mandatory respondent. I have gone over your time. Why don't we hear from Mr. Denning for a second? Thank you, Your Honor. Good morning, Your Honors. I am Jeff Denning, appearing on behalf of the U.S. Magnesium appellee defendant. I'm going to try not to repeat what the government said, but backstop as much as I can. First, Mr. Riggle indicated that the problems with the verification occurred very, very late in the whole process. I believe he said on the last day. That's incorrect. The 2007-2008 administrative review had two verification phases. One was the sales verification that occurred at TMI's facilities, and the second were the factors of production cost verifications that occurred at TMI's unaffiliated suppliers. Two different facilities, two different production facilities for the supplier. On the second day of the cost or factors of production portion of the verification, not the last day, the cost verification was a week long, but on the second day of the cost verification at one of the two suppliers, the Department of Commerce attempted to review inventory records for raw materials going into the production process and output subject merchandise coming out of the production process. And the verifiers were told that those records were not available, that the individual, the statistician that was responsible for maintaining those records was not on site, and so the department was not allowed to view those records. So on the second day of the cost verification, the department's verifiers were denied access to probably the most key information that the department views during cost verification, the records of what is consumed, the records of what is produced. So the problems did not arise on the last day of verification. But again, even if that's true, all of these facts, which everybody likes to emphasize, the great facts that occurred once they showed up at the supplier, how are those facts chargeable to TMI? TMI is the respondent in this case. The questionnaires were all issued to TMI. The questionnaire responses were all provided to the department from TMI. The supplier didn't ever provide any information directly to the department, or vice versa. The department spells out in great detail in the retermination on remand that TMI's officials and council, and local council, but TMI's officials were very, very involved with preparation of the cost responses, compiling the data, participation in verification, preparation for verification. This is TMI officials' work, had access to the supplier's information, compiled that information, put it in a form acceptable to the department, sent it to the department. TMI officials and council and local council went through the verification, was on site throughout the whole process, was there when the documents were thrown out of the windows, was there when the department's officials were locked out of rooms. TMI's officials were very, very involved with this entire process. It is just not accurate to say that TMI was a conduit for the information from the large supplier, that this information all came from the supplier, and TMI had no choice but to take it and then turn it over to the department. And even if that was true, even if the information was merely funneled through TMI, that's not enough. TMI is submitting this information to the department under certification. Council is certifying this information. The trial court found that TMI had a duty to ensure the accuracy of the information it provided to the department. Think about how this process would work if exporters, when unaffiliated suppliers, could say, it's not our information. There would be no way to ensure that this information has any credibility, lest the department can say, when you certify it to us that it is accurate, you must mean it. You must have taken reasonable steps to ensure the accuracy of this information. The details that you mentioned, all of the things that transpired during that verification, this is big stuff. There's a large accounting suite that the department described as basically a document mill. How could TMI's officials not have seen that? As soon as they saw that, they should have brought that to the department's attention if their goal was to be accurate in what they're providing to the department. The department talked about that fact and the redetermination said that if TMI was diligent, they would have discovered these issues and they would have brought it to the department's attention. The trial court said exactly the same thing. If TMI was diligent during the verification, they would have discovered this information, would have withdrawn the claim as for the byproduct offsets, would have brought these issues to the department's attention. That never happened. Let's talk a minute about the significance of the byproduct offsets. Well, we don't have a minute. Let's talk very quickly about the significance of byproduct offsets. In the preliminary results, TMI's margin was 9.1% and it received both of the byproduct offsets. During that phase of this administrative proceeding, TMI was arguing values for the byproduct materials that were absolutely through the roof. The cement clinker was said to be, the waste clinker was said to be cement clinker. A cement clinker is a precursor for cement. That is a high-value product. I don't want to bring it to a close, though. The clock has run out. So the significance of the byproduct offsets was great and it was very, very meaningful to TMI, not to the supplier, but to TMI to get those byproduct offsets. What would have been the difference in the rates if there was no byproduct? I'm afraid I do not know that number off the top of my head and it would surely be BPI, so I couldn't provide that. Somewhere between 9% and 111%, but it would have been a lot less than 100%. 111% is a calculated rate representing sales to the United States. No one has ever challenged any credibility with respect to that rate. With all due respect, 111% is the rate, is the amount to which pure magnesium was being dumped in the United States in 2006-2007 and TMI was right alongside Datui making sales to the same array of customers during that same time. That is a totally credible rate and it's really a gold standard in terms of AFA rates because it's a rate from only the prior year, very, very clean, unchallenged, never invalidated, never indicted. Sometimes companies dump. In 2006-2007 it was 111%. The rate from the original investigation in 1994, which became the China-wide rate and in fact was the China-wide rate in 2007-2008 when TMI was given total AFA, was 108%. So the two rates of significance in this proceeding are Datui's 111% and the 108% that was the China-wide rate and began with the original investigation. Okay, we have your argument included there. Now just to keep things even and fair, I think the other side went over about 4 minutes on their time in total, so why don't we add that to your remaining time if you'd like. Your Honor, may it please the Court. I have only some brief comments on this. Acting to the best of one's ability. If there's an absolute standard that requires complete correctness for unaffiliated parties, that's a standard that just can't be met. You do the best you can when you are a small company, but you can't get complete cooperation at all times. And second... But don't seek the offset. That is good advice after the fact. But when you don't see this coming, you don't know. Don't you prepare for verification? You prepare for verification, but there are hundreds of thousands of documents. No, but you know what you're claiming, and if you're claiming an offset, you know to prepare for the potential that Commerce is going to verify those figures. There was preparation, but you don't prepare for somebody who is not being completely truthful with you. But... It is impossible. You sometimes have to take things on faith. This is business. And as businessmen, TMI accepted certain things of the supplier. It turned out not to be a good idea. And in hindsight, it was a terrible idea. But verification means more than acceptance, doesn't it? Verification means preparation. As lawyers, as counsel, goes and looks at the figures and asks, show me your sales invoices, show me your consumption reports, show me your ledgers, and then take those very steps that Commerce is going to do in tracking from one step to another in order to verify the figures. Isn't that what counsel does to prepare for verification? That's exactly what you do. But to believe that counsel can identify falsified documents that are in a language that he neither reads nor speaks begs credulity. I beg your pardon. But you can't... And even for my client, TMI... Wasn't there local counsel? There was local counsel as well. But again, this was a small matter. And for TMI, they wanted to get the main thing. The byproducts are something that if you lose them, you lose them. But you want to get the main product. But counsel, in a dumping case, an offset can make a big difference. And the size of an offset can make a huge difference in the margin or even the zero margin. It can, but it doesn't make as much difference as the surrogate value, frankly. The surrogate values, which you go to a third country, often are the make it or break it in a dumping case regarding China in a non-market economy. And so a small thing, a thing like this is considered much smaller than, say, a surrogate value for financial ratios or something like that, which in this case at one point had a financial ratio of 89%, which changes things significantly. Anyway, to go back to this, the original information in the verification report and the other memos don't talk about TMI's participation in this. It's only later. And it looks more like a justification by the department, a bootstrapping to get the high rate applied against TMI. Excuse me. Finally, I'm not arguing today that there should be no consequences to TMI. I'm only arguing that the atomic bomb rate of 111.73% is simply unreasonable. It has no basis, no relationship to TMI. There should be a rate calculated that has some basis in reality and is reasonable. And unless you have any questions, I'll end it there. I think we have your argument, sir. Thank you.